UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
ANTHONY AND ADELE GAGLIARDO,
       parent  of a disabled student,
            STEPHEN G.
                 Plaintiffs,

    -against-

                                                                       INDEX  No.:   04  civ  1802  (CM)
ARLINGTON CENTRAL SCHOOL DISTRICT
                Defendant.
-------------------------------------------------------------------------x

## SUPPLEMENTAL MEMORANDUM OF LAW IN

## SUPPORT OF PLAINTIFF'S

## MOTION FOR SUMMARY JUDGMENT

Dated:   September 19, 2005

                                              RosaLee Charpentier, Esq.

                                              Bar roll # rlc-2515

                                              Family Advocates, Inc.

                                              209 Clinton Avenue,

                                              Kingston, NY 12401

                                              Tel.: (845) 339-8080

To:  Leah Murphy, OF COUNSEL

Kuntz, et.al.

### a.  FAPE WAS DENIED IN 2002-03

**1.  Procedural Non-compliance**

**A.  CSE was not properly constituted**

The School District had the burden of demonstrating that the CSE which prepared the IEP was validly constituted.  It did not, and the SRO was not free to exempt them from this State and federal mandate.

The federal regulations, at 34 CFR 300.533(a)(3), require that the Defendant ensure that Stephen's placement decision was made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data and the placement options.  See State decisions requiring conformity with this federal provision, for example, Application of a Disabled Child, Appeal No. 98-37.  No one at the CSE meetings held to develop the 2002-03 IEP had served as Stephen's teacher at any time during the nine (9) months preceding the meetings.  On or about September 20, 2001, Stephen had ceased attending school.  On or about October 22, 2001 and for the remainder of the 2001-02 school year, Stephen participated in a homebound placement.  None of the home instructors attended any of his CSE or IEP planning meetings.

Pursuant to 34 CFR Section 300.344 note(1)(c), if the child has more than one teacher, the agency may designate which teacher will participate in the meeting.  Either the teacher or the agency representative should be qualified in the area of the child's suspected disability.  In this case, the District failed to introduce anyone with qualifications in counseling or teaching students with emotional disabilities, social anxiety, depression or even school avoidance, see pp. 26-28.  The SRO has invalidated IEP which were developed at meetings where no one present was specifically qualified

in the area of the child's suspected disability, see Application of a Disabled Child, No. 98-37.

In the absence of the child's teacher, the other participants at such meetings are deprived of the opportunity to obtain accurate information about the child's academic and social needs. Again, excepting the parents, there was no one present at either the June 11 or July 11 CSE meeting who had familiarity with Stephen.

Input from Stephen's current teachers was critical in determining appropriate behavioral strategies and supplementary aides and services, program modifications, and/ or other supports for the student (34 C.F.R. § 300.346[d]).  In its official interpretation of the Regulations, the U.S. Department of Education has indicated that "the regular education teacher who serves as a member of a child's IEP team should be a teacher who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions about how best to teach the child" (34 C.F.R. Part 300, Appendix A, Question 26).  Nowhere does the law permit the exemption of a school district from this mandate.

The IEP in question was developed on July 11, 2002 with "D. Wojack" as the Regular Education Teacher.  Stephen was never in  this teacher's class.  At the June 11, 2002 meeting, M. Wright was the teacher member.  Stephen had been in her Math class for a total of 2 weeks during September of the prior school year, i.e. September 2001.  After those two weeks, Stephen's teachers were changed to Sharon Kinnear for physics and math, and Wendy Weamer for English and History.  Neither Ms. Kinnear or Ms. Weamer were invited to, nor were they present at, either of the CSE meetings, p. 927.  Ms. Kinnear and Ms. Weamer became Stephen's teachers on October 22, 2001 and continued as such through the end of the school year.  D. Wojack was not one of

his current teachers when the CSE convened in December, 2001, in February 2002, in June 2002 or on July 11, 2002

In addition, the CSE neither employed nor consulted with a counselor who worked with Stephen during 2001-02 school year.  Finally, the District failed to ensure the attendance of a representative from the Karafin School at any of the CSE meetings held to plan for his placement thereat.  The statute contains language which is unequivocal:  the school district must ensure the participation of such representative, see 34 C.F.R. Section 300.349(a)(2).  Also see 8 NYCRR 200.4(d)(4)(i).  There is no provision in the relevant statutes which permit the school or state to waive this requirement.

The SRO found that where parents have met with a representative of the out-of-district school proposed by the CSE, CSE participation was unnecessary.  The SRO cited no provision of any statute which supported this proposition.  If the SRO's position in this matter were valid, parents could be compelled to meet individually with each of the required CSE members, and there would be no "opportunity for the collective exchange of views which is at the heart of the requirement that there be a CSE meeting", Application of a Disabled Child, No. 95-8. It is not simply the parents' right to obtain critical information about the proposed placement that is at issue, it is the CSE ability to formulate a reasonably calculated plan for the student.  Such planning is wholly undermined by the non-participation of someone directly involved with the proposed out-of-district placement.  Someone so entirely disconnected with Karafin, as the CSE Director, could not serve as its representative.

There is no information in the record about the District's attempts, if any, to arrange for Karafin to participate in the CSE meeting by telephone conference call, or

other alternative means of participation. Nor does the record afford any basis for finding that such participation at a meeting could not have been secured.

Finally, the SRO erred in overlooking the District's proposal of an IEP that was developed at an improperly constituted meeting.  Virtually all of his prior decision require such an IEP to be deemed a nullity.  The SED has promulgated that the absence of the child's teacher from both meetings affords an adequate basis for annulling the decision of the hearing officer and the recommendation of the CSE, see <u>Application of a Child with a Handicapping Condition,</u> Appeal No. 90-16 (*Commissioner held that the CSE's determination is, on its face, invalid where a required member of the CSE had not participated in the CSE recommendation*); <u>Application of a Child with a Handicapping Condition</u>, Appeal No. 92-31 ("*In the absence of a validly composed CSE, [the SRO] must invalidate the child's IEP prepared by the CSE"*; ; <u>Application of Child with a Disability</u>, Appeal No. 95-8 (*the child's IEP which the CSE prepared at its July 19, 1994 meeting was a nullity because the child's teacher did not attend or otherwise participate in such meeting*).   Also see <u>Application of a Child with a Handicapping Condition</u>, Appeal No. 91-39; <u>Application of a Child with a Handicapping Condition</u>, Appeal No. 90-22;  <u>Application of a Child with a Handicapping Condition</u>, Appeal No. 92-26; <u>Application of a Child with a Handicapping Condition</u>, Appeal No. 92-9; and <u>Application of a Child with a Handicapping Condition</u>, Appeal No. 92-41).

### B.  IEP PROVIDED TO KARAFIN CALLED FOR REGULAR EDUCATION

5

The IEP provided to the Karafin School for purposes of eligibility and admission called for placement into fulltime mainstreaming, Exhibit #4. The District thus improperly delegated to Karafin the task of determining what Stephen's educational needs were, see pp 388 ("this is 2002-03, I would not have seen that, I would have seen 2001"), 381 ("nor did the School District say to us they want him there") ("we must be in possession of the IEP"), 397 (Karafin decided Stephen was appropriate for their school some time prior to March 1st). After sending the initial "packet" of information regarding Stephen, the District did not undertake updating the information provided to Karafin, p. 307.

Without benefit of an IEP dictating the student's needs, Karafin was either unable to accept Stephen or required to conjure-up its own notions of an appropriate placement for him. This State has held that a CSE may not delegate to others the task of determining the amount or nature of the services which a pupil requires See Application of a Disabled Child, No. 00-015 Application of a Child with a Handicapping Condition, Appeal 90-12; Application of a Child with a Handicapping Condition, 29 Ed Dept Rep 291 [1990]).

Karafin had not accepted Stephen since it never received the proper IEP, and had no communication from the parents or the District subsequent to the parents' visit in February 2002, p. 381 ("we must be in possession of the IEP, we must be in possession of the stack form before we admit a child"). Karafin had yet to complete its intake process, pp. 388-9 ("had to consult with his guidance department at his home school to see that we, that we were in fact meeting his needs and meeting the requirements of that school district.") The SRO has held that a CSE's recommendation for placement into a program prior to a decision by that program that it would accept the child is

premature, and does not satisfy a board of education's obligation to offer the child an appropriate educational program (Application of a Child with a Handicapping Condition, Appeal No. 92-3; Application of a Child with a Handicapping Condition, Appeal No. 92-25; Application of a Child with a Disability, Appeal No. 93-15).

A CSE may not delegate its responsibility to recommend a program or placement to a BOCES (Application of a Child with a Handicapping Condition, Appeal No. 91-25; Application of a Child with a Handicapping Condition, 28 Ed. Dept. Rep. 376). It was the District's CSE which could not determine whether the proposed out-of-district program could be implemented, i.e. was available and appropriate, because it had not provided Karafin with the necessary information about the child. A placement recommendation which cannot be implemented is not an appropriate placement (Matter of a Handicapped Child, 20 Ed. Dept. Rep. 138; Matter of Bd. of Ed. Buffalo City School District, 21 id. 527).

**2. IEP NOT REASONABLY CALCULATED**

**A. EVALUATIVE DATA INSUFFICIENT**

At both the June 11, 2002 meeting and at the July 11, 2002 meeting, the CSE identified the need for additional evaluative information prior to its finalization of the 2002-03 IEP. Testing was not performed until July 31, 2002 and was never considered or reviewed by the CSE, pp. 283-4. In fact, the IEP had already been finalized, Exhibit #5. This practice ignored the mandatory procedural burdens imposed upon Districts to use assessment tools that yield relevant information for ascertaining the educational needs of the child. See 34 C.F.R.300.532.

An appropriate program begins with an IEP which accurately reflects the findings of a child's evaluation (Matter of Handicapped Child, 23 Ed. Dept. Rep. 386), and which considers the child's present levels of development and individual needs (8 NYCRR 200.4 [c][2]).  State regulation requires that, in developing a child's IEP, a CSE must consider the child's academic or educational achievement and learning characteristics, the child's social development, the child's physical development and the child's management needs (8 NYCRR 200.1 [kk][1]). The IEP must reflect consideration of current data regarding each of these areas.  Specifically, federal regulation requires that an IEP include a statement of the student's present levels of performance (34 C.F.R. § 300.347[a][1]). State regulation requires an IEP to describe a student's present levels of performance and indicate his individual needs with respect to educational achievement, physical development, social development, and management needs (8 NYCRR 200.4[d][2][i]).  The information must be sufficiently detailed to enable the CSE to prepare appropriate annual IEP goals for the student (Application of the Bd. of Educ., Appeal No. 01-092).

The SRO has repeatedly held that a CSE's failure to record current information about the child's levels of performance in his IEP is a serious flaw in the IEP for example, see Application of a Child with a Disability, Appeal No. 93-12), and that a District may not rely upon -or blame others, or the purported actions of others as a basis for ignoring its responsibility to prepare an IEP which reveals the child's present levels of performance in particular see Application of a Child with a Handicapping Condition, Appeal No. 90-23; Application of a Child with a Disability, Appeal No. 93-24). Also see Application of a Child with a Disability, Appeal No. 94-4.

The CSE was mandated to obtain sufficient current information about the child to prepare an IEP which would address the child's present needs (Application of a Child with a Handicapping Condition, Appeal No. 91-21; (Matter of a Handicapped Child, 24 Ed. Dept. Rep. 417). In New York State, it is understood that what constitutes a suitable evaluation depends upon the nature of the child's disability and the nature of the change in the child's placement (Application of a Child with a Disability, Appeal No. 93-22).

In this case, the student's IEP was being changed from fulltime mainstreaming with one period daily of special education to a fully segregated school for disabled students in classes ranging from 1 student: 1 teacher to 6 students: 1 teacher. The CSE's justification for this arose from the student's behaviors around school attendance. A functional behavioral assessment is required in the initial evaluation of the child, and both state and federal regulations also provide that any subsequent IEP review "shall. . .in the case of a student whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including behavioral interventions, and supports to address that behavior" (8 NYCRR 200.4[d][3] [emphasis added], 8 NYCRR 2004.[f][1][i]; 34 C.F.R. § 300.346[a][2][i], 34 C.F.R. § 300.346[b]).

Federal regulations specify that "a failure to, if appropriate, consider and address these behaviors in developing and implementing the child's IEP would constitute a denial of FAPE to the child" (Appendix A to Part 300 Notice of Interpretation, Section IV, Question 38). The CSE here failed to first accurately assess the child's behavior, drawing upon a variety of sources, including tests, parent and teacher input, and adaptive behavior, and ensure that the information obtained is documented and carefully considered (34 C.F.R. § 300.535[a][1], [a][2]). In so doing, the CSE had an

9

affirmative obligation to administer tests and other evaluation materials as needed to ascertain whether any additional modifications to the IEP are necessary in order for the child to participate in the general curriculum (8 NYCRR 200.4[b][5][iii]) including using instruments that may assess the contribution of behavioral factors, where appropriate (20 U.S.C. § 1414[b][2][C]; 34 C.F.R. § 300.532[i]). These tests must be tailored to assess the particular area of need of the child, not merely provide a general intelligence quotient (34 C.F.R. § 300.532[d], 34 C.F.R. § 300.536[b]; 8 NYCRR 200.4[b][6][iii]).

Thus, a CSE must accurately identify a student's needs as a first step when amending his or her IEP, which would include, where behavior is at issue, performing a functional behavioral assessment and/or adding a formal behavior management plan to the IEP where appropriate, again see decisions of this SRO, Application of a Child with a Disability, Appeal No. 01-094; Application of the Bd. of Educ., Appeal No. 01-060; Application of a Child with a Disability, Appeal No. 00-081; Application of a Child With a Disability, Appeal No. 99-56). Once the behavior is assessed, where behavioral concerns exist, any new IEP must specifically reflect which behaviors must be changed or refocused in order for the child to achieve academic success (Application of a Child with a Disability, Appeal No. 93-15).  Clearly the IEP in question here lacks such specificity.

### B. KARAFIN OFFERED STUDENT-TEACHER RATIOS UNDER 6:1:1

Federal and State regulations require that, to the maximum extent appropriate, each child must be educated in the least restrictive environment (34 CFR 300.550[b][1]; 8 NYCRR 200.6[a][1]).  The SRO failed to consider this requirement when he approved Karafin for Stephen. In the continuum of alternative placements which must be available

for disabled children (34 CFR 300.551), the program recommended by the CSE here, i.e. 6:1:1, is one of the more restrictive programs permissible in New York State.

The LRE provisions require that separate schooling or other removal of children with disabilities from an educational environment where there are non-disabled peers occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (34 CFR 300.550 [b][2]).  Specifically, the New York State Regulations define least restrictive environment as: ". . . that placement of an individual pupil with a handicapping condition which:

(1) provides the special education needed by the pupil,

(2) provides for education of the pupil to the maximum extent appropriate with other pupils who do not have handicapping conditions; and

(3) is determined following consideration of the proximity of the placement to the pupil's place of residence."

Karafin is located in a distant town, Mt. Kisco, which is two counties away from Dutchess County and Stephen's home.   Uncontested testimony established that Karafin is 1.5 to 2.0 hours away from Stephen's home and treating therapist, p. 795, p. 820.  In addition to legal considerations arising under the LRE principal, the distance is such that he would not be able to receive school- home counseling collaboration or overlap.

State regulation provides that 6:1:1 classes are for children with highly intensive management needs who require a high degree of individualized attention and intervention (8 NYCRR 200.6 [g][4][ii][a]).  State regulation provides that classes of that approximate size which are taught by a teacher with the assistance of an aide are for children whose management needs interfere with the instructional process, to the extent

11

that an additional adult is needed within the classroom (8 NYCRR 200.6 [f][4][i]). Neither the proposed IEP here nor the entire record reveals a basis for concluding that Stephen's management needs require his placement in such a restrictive setting, see Application of a Child with a Disability, No. 92-39.

The CSE must also consider the unique benefits, academic, and otherwise, which the child may receive by remaining in regular classes, e.g., language and role modeling with non-disabled peers (Greer v. Rome City School District, 950 F. 2d 688 [11th Cir., 1991]).  There was no evidence regarding the impact that full-time segregation into a school exclusively populated by students with emotional and learning disabilities would have upon Stephen.  This, in light of the CSC conclusions about Stephen's sensitivity to peer grouping, was unreasonable and inappropriate, see Exhibits #10 and #28.

At least some of the classes provided at Karafin would have been in class sizes of one other student, pp. 381-2 ("one-to-one basis").  The CSE's plan to change Stephen's IEP from regular education to one-to-one programming was insupportable. Federal regulation requires that each school district have a continuum of alternative placements to meet the needs of children with handicapping conditions, (34 CFR 300.551 [b]).

The State has also declared that a 6:1:1 class is a more restrictive placement than a 12:1:1 class, Application of a Child with a Disability, Appeal No. 94-7.  In that case, the SRO held that "*Absent evidence that the child could not successfully function in the 12:1:1 class, [I find] that it is the least restrictive environment for the child.*")  At Oakwood, the average class size was 15, p. 607, and indeed, Stephen flourished in that setting.

## C.  DISTRICT FAILED TO DEMONSTRATE CLASSMATES WERE SIMILAR

State regulation requires that children with handicapping conditions who are placed in special classes be grouped by similarity of individual needs, including academic or educational achievement with similar learning characteristics, social development, physical development, and management needs (8 NYCRR 200.6 [f][2]). State regulation requires that children in special education classes be appropriately grouped using the criteria of levels of academic achievement and learning characteristics, levels of social development, levels of physical development, and the management needs of the children (8 NYCRR 200.6 [a][3]).  See Application of a Child with a Handicapping Condition, Appeal No. 91-25.

As part of its burden of proof, the District was required to show that Stephen would be suitably grouped for instructional purposes with children having similar individual needs, see 8 NYCRR 200.6[g][3]; and also Application of a Child with a Disability, Appeal No. 98-32; Application of a Child with a Disability, Appeal No. 99-34).

In Application of a Child with a Disability, Appeal No. 00-014, the SRO held that the District's failure to establish that the proposed classes would have students with similar needs compelled a finding that respondent failed to meet its burden of proof regarding the appropriateness of the proposed IEP.  The record here reveals little information about the nature of the proposed classes.  Dr. Greenfelt testified that the advanced science courses may be taught in one-to-one teacher-stduent ratios, Transcripts, p. 382.

There was very little information provided here about the needs of the other pupils in the recommended classes.  The SRO has held that where only brief testimony

13

about the proposed classes is made, such evidence must be deemed inadequate to establish that the child would have been appropriately grouped with children of similar needs (8 NYCRR 200.6 [f][2]).  A CSE must have adequate information about the needs of the other children in a BOCES class to determine the similarity of needs, before it can recommend such a class for a child (Application of a Handicapped Child, 25 Ed. Dept. Rep. 81).  The record in this case strongly suggests that the CSE had no such information, Application of a Handicapped Child, No. 91-25.

In the absence of evidence as to the learning characteristics and needs of the other children in the BOCES class, I find that respondent has not met its burden of proof in establishing that such class was appropriate for petitioner's child (Application of a Child with a Handicapping Condition, Appeal No. 91-8; Application of a Child with a Handicapping Condition, Appeal No. 90-21; Application of a Child with a Handicapping Condition, Appeal No. 90-14).

The similarity of abilities and needs may be demonstrated through the use of a profile of a children's proposed class together with the testimony of a witness who is familiar with the children in the proposed class (Application of a Child with a Disability, Appeal No. 93-13; Application of a Child with a Disability, Appeal No. 94-5). Sro No. 94-7.  At hearing, the parents requested, and the District acknowledged it was in possession of, information required to determine the proposed class profiles at Karafin, p. 207.  Nonetheless, neither the parents nor the hearing officer received this information.


**D.   CSE MADE RECOMMENDATION WITHOUT REVIEW OF ANNUAL GOALS**

In Application of a Child with a Disability, Appeal No. 94-4, the school argued that its CSE did not need to have IEP goals in order to make its recommendation. There, the SRO held that this *"is not only contrary to the express provisions of State regulation, but also reflects a misunderstanding of the process by which IEPs are prepared in annual reviews. It is incumbent upon the CSE to review the child's achievement of the annual goals and short-term instructional objectives from the child's existing IEP, as well as the results of standardized tests and information from the child's teacher, in order to determine the child's present levels of performance and to prepare appropriate annual goals and short-term instructional objectives for the child's new IEP. The annual review process provides a mechanism for determining whether the child is progressing and whether the services which the child is receiving are appropriate to the child's special education needs"* citing 34 CFR Part 300, Appendix C, Question 37. The State there required that the *"CSE must accurately assess the child's progress and develop new appropriate goals and objectives, before determining what would be an appropriate program and/or services in order for the child to achieve such goals and objectives."* Application of a Child with a Disability, Appeal No. 94-4.

As detailed above, the CSE first identified Karafin School as Stephen's placement and then developed the goals and objectives. In doing so, the CSE failed to employ a reasonable process for determining Stephen's educational needs. Again, the law requires that the IEP team must first *"... review existing evaluation data ... [and] ... [o]n the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine ... present levels of performance and educational needs of the child; ... [and] ... [w]hether any additions or modifications to the special*

*education and related services are needed to enable the child .... to participate, as appropriate, in the general curriculum.*" Id., citing 34 C.F.R.300.533(a)(l) and (2).

### E. KARAFIN DID NOT MEET STEPHEN'S NEEDS

By its own description, Karafin is not designed for student's with social phobia; it characterizes itself as a school for students with perceptual and neurological impairments, unmotivated, slow learners, and students with reading problems. Stephen had none of these characteristics. The Karafin representative, Dr. Greenfieldt, testified that Karafin was "a school for the underachiever" and "for students with some type of learning problem" p. 373. Stephen is neither an underachiever nor a boy with learning disabilities; he has severe depression and anxiety focused on socialization and school attendance.

The nature and type of class instruction at Karafin was also inappropriate for Stephen. Stephen needed a school setting which offered the possibility of class participation. Karafin could not provide that. Classes there were largely unstructured, with actual instructional groups not larger than two or three, p. 780, p. 793-4. Karafin did not employ traditional classroom-type instruction, p. 779-80, AND p. 384. Stephen saw one-to-one instruction occurring while other students waited, or slept, p. 793-4. This would not have enabled him to be part of a regular school experience and that is what he desperately needed.

Karafin's classroom procedures were conducive to independent activities, leaving the classroom, and even napping, during class, also p. 894. Stephen was alarmed to learn that students at Karafin School had "litigation pending" against them, pp. 794-5,

and the police were regularly called in to assist with discipline, pp. 825-30. He was fearful of this and told his parents he was "frightened about going there", p 795-7.

## CONCLUSION

This Court should annul the Decision of the SRO. The parents request that this Court grant their Motion for Summary Judgment and order full reimbursement for tuition and related costs.

Dated: September 19, 2005        Submitted by,

RosaLee Charpentier,Esq.

Bar roll # RLC-2515

Family Advocates, Inc.

209 Clinton Avenue,
Kingston, NY 12401
Tel.: (845) 339-8080

To:  Leah Murphy, Esq.
For the School District