UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x

ANTHONY AND ADELE GAGLIARDO,
PARENTS OF A DISABLED STUDENT
STEPHEN G.,

               Plaintiffs,                  04 Civ. 1802 (CM)

      -against-

ARLINGTON CENTRAL SCHOOL DISTRICT,


               Defendants.


——————————————————————————x


DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:


      Plaintiffs, pursuant to the Individuals with Disabilities in Education Act (IDEA), appeal
from an order of the State Review Officer (SRO) denying their appeal from an adverse decision
of an Impartial Hearing Officer (IHO).  Plaintiffs seek tuition reimbursement from the school
district for the unilateral placement of their son at Oakwood Friends School in Poughkeepsie,
New York. Both sides move for summary judgment.

      This is not the usual IDEA case, in which the school district seeks to provide the disabled
child with services in the school, while the parents demand a private education at public expense.
In this case, both the parents and the district agree that Stephen G. belonged in a private school
for the 2002-03 school year. They differ only over which school that ought to be. The district, in
Stephen's Individualized Education Plan (IEP), recommended placement at The Karafin School
in Mt. Kisco. The parents instead sent him to Oakwood Friends Academy in Poughkeepsie,
where they lives.

      This case is also unusual in that it has an extensive procedural history in this court, and
raises a claim of alleged IHO bias against the parents.

      The case originally reached this court after the SRO dismissed the parents' appeal from
the IHO's adverse decision without addressing the merits, on the ground that it was untimely. It
turned out that the SRO was operating under the mistaken premise that the parents had waited
months after receiving the IHO's decision to lodge their appeal. In fact, neither side had received
the IHO's decision until two months after it was dated and allegedly mailed. While the appeal

was indeed untimely, it was untimely by just one day – not by months, as the SRO believed. This court remanded the matter to the SRO for a merits-based determination.

On remand, the SRO found that there had been no IHO bias and that the IHO's decision was correct. The parents press both issues on appeal to this court.

I conclude, after *de novo* review of the entire record and for the reasons stated below, that the SRO's decision should be reversed. Plaintiffs are entitled to be reimbursed for the cost of sending their son to Oakwood Friends Academy in Poughkeepsie, where the family lives and where Stephen could receive a traditional (and hence least restrictive) education in a setting that catered to his emotional needs. Accordingly, plaintiffs' motion for summary judgment is granted and defendants' motion is denied.

## **Standard of Review**

The SRO's decision is subject to independent judicial review. This means that the court reviews the record *de novo*. However, as the United States Supreme Court has cautioned, this fact "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities..." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982). Nor may federal courts simply rubber stamp administrative decisions. Rather, they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult questions of educational policy. Walczak, 142 F. 3d at 129.

As the Second Circuit noted in Walczak, administrative deference is appropriate where the state hearing officers' review has been thorough and careful. However, a court can only defer where findings have been made; where there are no administrative findings on an issue germane to the court's determination, deference would be inappropriate.

### **Tuition Reimbursement: Unilateral Placement**

Where, as here, we are dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A Board of Education may be required to pay for educational services obtained for a student by his or her parent, if (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim. *See* M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F. 3d 96, 102, 104 (2d Cir. 2000), *cert denied*, 532 U.S. 942 (2001); *see also* Walczak, 142 F.3d at 129 (*citing* Burlington Sch. Comm. v. Dept. of Educ., 471 U.S. 359 (1985)). These three factors will be referred to as the "Burlington factors."

### **Burden of Proof**

For at least two decades, the rule in this Circuit was that the district bore the burden of proof on the adequacy and appropriateness of its recommended placement, *see* M.S., 231 F.3d at 102; Walczak, 142 F.3d at 122; *see also* Burlington Sch. Comm., 471 U.S. at 359. This long-settled rule was recently overturned by the United States Supreme Court. Schaffer v. Weast,126 S.Ct. 528, 537 (2005). In Schaffer, the Supreme Court concluded that the burden of proving every Burlington factor at an administrative hearing challenging an IEP properly rests upon the party seeking relief – which in almost every case is the parents. [1]

**Adequacy and Appropriateness of the Services Offered by the District**

Two issues are relevant in deciding whether an IEP does or does not afford a child a free appropriate public education: whether the state complied with the procedural requirements of IDEA and whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07.

Procedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that individually or cumulatively result in the loss of educational opportunity, or that seriously infringe on a parent's participation in the creation or formulation of the IEP, constitute a denial of FAPE. Knable v. Bexley City Sch. Dist., 238 F. 3d 755, 766 (6th Cir. 2001), *cert. denied*, 533 U.S. 950 (2001).

The "reasonably calculated" test is a backward looking test – that is, the court must determine whether, at the time it was implemented, the IEP was designed to afford some educational benefit to the child. Thus, it is inappropriate to base a decision in a case like this one on the results achieved in a unilateral placement. J.R. v. Bd. of Educ. Of City of Rye Sch. Dist., 345 F.Supp.2d 386, 395 (S.D.N.Y. 2004); Antonaccio v. Bd. of Educ. Of Arlington Cent. Sch. Dist., 281 F.Supp.2d 710, 724 (S.D.N.Y. 2003). However, IDEA itself empowers a court to consider material outside the administrative record in conducting its *de novo* review of the record. 20 U.S.C. § 1415 (i)(2)(B)(I)-(iii).

**Propriety of Chosen Placement**

In addition to proving that the IEP is inadequate, the parents must establish that the school chosen by them for a unilateral placement offered appropriate services for their child. This burden is stringent but not impossible to meet. The parents must establish that the private placement is appropriate for the child, not that it is perfect. M.S., 231 F. 3d at 105; *see also* Warren G. v. Cumberland County Sch. Dist., 190 F. 3d 80, 84 (3d Cir. 1999). Parents satisfy their burden by showing that their unilateral placement offered an educational program that met their child's special needs. M.S., 231 F. 3d at 102; Walczak, 142 F. 3d at 149. The parents'

---

[1] It is naive to think otherwise. This court handles dozens of IDEA appeals every year. I can think of not a single instance in which the district sought an impartial administrative hearing. Indeed I cannot imagine why it ever would, since the district's CSE devises and adopts the IEP.

unilateral placement need not have certified special education teachers or an IEP for the disabled student in order to qualify as appropriate. Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 14 (1993). Moreover, while an IEP devised by a school district must provide the student with an education in the least restrict environment, a parent's inability to place his child in the least restrictive environment does not bar parental reimbursement. M.S., 231 F. 3d at 105, *citing* Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss, 144 F. 3d 391, 400 (6th Cir. 1998).

With these standards in mind, we turn to the record.

## Procedural History for Stephen G.

### Initial Interaction Between Parents and CSE

Stephen G. was a 17 year old high school senior in September 2002. He resided with his family in Poughkeepsie, New York, in Dutchess County. He was classified as a student with an emotional disturbance and was deemed eligible for special education programs. 8 NYCRR 200.1[zz][4].

Stephen was first referred to the defendant district's Committee on Special Education (CSE) by his parents on March 16, 2001. He had a endured years of being teased and bullied at the Arlington Public Schools, to the point where he was afraid to go to school. Stephen first exhibited symptoms of depression in the fifth grade and began seeing a therapist on a weekly basis in 1996, when he was in the sixth grade. He also began putting on substantial weight at that time. Stephen began treatment for depression in April 1998, and for social anxiety in December 2001. His treatment included various trials of antidepressants.

Stephen attended Arlington High School in the ninth grade and performed well, scoring a solid B average (81 in English, 81 in Global History, 87 in Math, 81 in Physical Science) except for foreign language (66 in Italian II). He was threatened by another student in October 1999, however, and his grades declined over the course of the year.

Stephen attended Arlington High School for tenth grade during the 2000-01 school year. His anxiety increased, and by February he refused to go to school. His parents admitted him to the Adolescent Intensive Outpatient Program (AIOP) at St. Francis Hospital, where he underwent a mental status examination and a problem appraisal. The social worker at St. Francis noted that he was receiving care for various conditions, including recurrent severe depression, for which he was taking medication. Stephen participated in group, family and individual counseling to address problems including his difficulty in school. The social worker, while recognizing that the goal should be to get Stephen back in school, opined that he would need a structured educational setting before transitioning back. She recommended extended home tutoring. The district began providing home tutoring on or about March 7, 2001.

As noted above, on March 16, 2001, Stephen's parents referred him to the CSE. On March 23, Stephen was referred to Dutchess Intensive Day Treatment (IDT) as a transitional

placement from hospital to public school. He was scheduled to attend IDT for 30 days.

In April 2001, Stephen's parents consented to an evaluation of their son and completed a social history, indicating that he had been teased and bullied by other students and that he had a history of depression and did not want to attend school.

The district's psychologist administered the standard intelligence tests, which revealed that Stephen had an IQ in the high average range (117), average achievement in reading and writing and superior achievement in mathematics. Additional testing revealed Stephen's anxiety and depression and his exclusion from social interaction.

On June 11, 2001, the CSE classified Stephen as having an emotional disturbance. The CSE developed an IEP for the 2001-02 school year, when Stephen would be a junior in high school. It recommended that he receive resource room services one period per day, individualized counseling once per month and various testing modifications. The parents consented to the IEP.

Stephen returned to Arlington High School for the last two weeks of tenth grade. His final grades for the year plummeted from their previous satisfactory level: 65 in English, 73 in Global History, 36 in Math and 81 in Biology. Despite his superior scores in Math achievement during testing, he did not pass the Math Regents exam, and he had to repeat the course during the summer.

Stephen began his junior year at Arlington High School, but by September 20 he was refusing to attend school. On October 16, 2001, his treating psychiatrist indicated that Stephen could not attend school due to severe anxiety and depression. Defendant district arranged for home schooling on October 22.

**The NYU Evaluation**

In November 2001, Stephen's parents arranged for a psychiatric evaluation of their son at New York University's Child Study Center. On November 13, they withdrew their consent for Stephen's IEP, on the ground that his needs had changed since the IEP was developed six months earlier. The parents asked for a CSE meeting and extension of home instruction.

The results of the NYU evaluation were reported to Stephen's parents in early December 2001. Dr. Ditkowsky, Director of Clinical Services at NYU, recommended that Stephen would benefit from an alternative placement, in light of his anxiety and history of depression. He also recommended a setting with a smaller student-to-teacher ratio and a more supportive or therapeutic environment. Dr. Ditkowsky emphasized that Stephen needed to reintegrate into a school setting, cautioning that home instruction was enabling Stephen to avoid school and making his problems worse. Finally, Dr. Ditkowsky observed that Stephen should be placed in a school with an academic curriculum at an appropriate level given his abilities. The recommendation that Stephen attend a school with a lower student-teacher ratio and a strong

academic curriculum was echoed by his treating psychiatrist in December 2001. (Ex. 29).

The final NYU report was received on February 7, 2002. NYU's Director of Clinical Services opined that Stephen suffered from Dysthymia with intermittent Major Depressive Episodes and Social Phobia. He indicated that Stephen's impairment was of sufficient severity that he would not easily adapt to the public high school setting, and recommended a smaller, structured yet therapeutic or more supportive setting in which his educational and emotional needs could be met.

In a subsequent telephone interview with the CSE, Dr. Ditkowsky indicated that Stephen's anxiety was what prevented him from returning to school, and recommended a small setting where people could work with him when he was anxious and help him with anxiety management. He stressed that someone within the school setting should know how to help a student deal with anxiety, and recommended that this person be a "point person" with whom Stephen could "check in" on a daily basis. Dr. Ditkowsky indicated that it might be difficult to find a good mix of students, ages and issues for group therapy, but recommended that there be formal group intervention outside of school.

The transcript of the CSE meeting at which Dr. Ditkowsky participated makes clear that he was not necessarily recommending "therapeutic schools" for Stephen. However, he did believe that the boy should attend "maybe an alternative program within the mainstream or something [where] there was just enough flexibility or structure and people with expertise that they were really able to work, one on one, with people, kids going through rough times and help them." (Ex. 116).

Dr. Ditkowsky particularly emphasized the importance of an academic curriculum that was sufficiently challenging so that Stephen could learn.

**The Search for a School**

The CSE met on December 12, 2001. The parents requested additional home instruction while they explored their son's condition further. However, the parents asked the school to accept the NYU evaluation as the primary source of current information.

The CSE described to the parents several different alternative high school programs, including The Karafin School, a small, special day school in Mt. Kisco, New York, that was approved by the State Commissioner of Education. After receiving two letters from Stephen's treating psychologist, the district continued to provide him with home instruction pending a determination of the appropriate placement for him. (Ex. 32).

In January 2002, at the parents' request, the district's Director of Special Education arranged for the G. Family to visit Karafin "purely on an exploratory basis." The visit was to be exploratory only because the CSE was not yet prepared to recommend that placement. Also during January, the parents went to an agency called LifeCare, Inc. to explore independent

schools. This organization recommended Oakwood Friends School.

On February 11, plaintiffs authorized the release of Stephen's file to Karafin and other schools that were discussed at the CSE meeting.

On March 1, the family visited Karafin and met with the school's associate director, Dr. Donow. The visit went poorly; the family witnessed inappropriate behavior by students in the classroom, and Stephen felt threatened by the environment there. In particular, Stephen "noticed the kids arguing in the class, being very unruly" (Tr. 820), and Dr. Donow informed the family that a few of Karain's students had criminal histories and/or were placed there by the courts. (Tr. 794, 826). This made Stephen very uncomfortable due to his prior traumatic experiences with bullies at Arlington High School. (Id.). In addition, "[H]e saw that there was no interaction with anybody there... one kid was being one-on-one taught while another kid was sitting on the desk with his head down sleeping and [in] another class the kids were just doing what they wanted to." (Tr. 793).

Shortly after this disastrous visit, the parents hired counsel to assist them in their dealings with the district. Counsel recommended that a neuropsychologist, Dr. Rissenberg, evaluate Stephen.

On April 29, 2002, the parents asked for another CSE meeting. In a letter to the district, they advised that they had visited the various schools discussed in the February 2002 meeting and found all of them inappropriate for their son.

At about the same time, the parents applied for Stephen's admission to Oakwood and authorized the release of information to that school. They did not notify the defendant district that they were taking this step. They did, however, notify Dr. Rissenberg that they hoped their son would attend Oakwood.

Oakwood Friends School is located in Poughkeepsie. It is accredited by the New York State Association of Independent Schools and chartered by the State Board of Regents. It offers a progressively challenging college-preparatory curriculum, including a special program for seniors. Classes are small, averaging 12 students per class. Instruction is traditional, with homework and other independent study expectations. There are personal and group goals and activities, including weekly Core Group meetings and an off-campus community service program. Ninety-eight percent of Oakwood's graduates continue on to colleges and universities.

At Oakwood, bullying and peer ostracizing is not tolerated. As a Quaker school, Oakwood promotes an atmosphere of tolerance and respect, which is fundamental to the school's philosophy. Participation in extracurricular activities (which of course builds social skills) is mandatory, as is one sports or physical education activity each term.

Oakwood is not approved by the New York State Department of Education for the provision of special educational service. What this means, as a practical matter, is that the State

will not provide reimbursement to a school district when a child is placed there pursuant to an IEP. Oakwood does, however, accept students with mild learning disabilities and provides them with services through its Academic Support Center. (Ex. 96).

**The District Recommends Placement at Karafin**

In a letter dated May 16, the parents notified the district's Director of Special Education, "Your evaluations of my son are not correct in diagnosing his disability, therefore not correct in educating or treating him," and asked that their chosen neuropsychologist evaluate Stephen at district expense.

The parents had been notified during the 2001-02 school year that progress toward meeting Stephen's IEP goals could not be achieved because he was being tutored at home. Noentheless, Stephen's final report for that school year showed considerable acadmic progress: he earned final grades of 77 in English, 79 in U.S. History, 73 in Math and 80 in Physics. However, he did not pass the English or Physics Regents exams that were administered during that school year. After summer tutoring provided by the district, Stephen passed both exams on his second try.

The CSE met on June 7, 2002, to conduct Stephen's annual review. They reviewed the letter explaining the parents' dissatisfaction with the schools they had visited (including Karafin). The parents were asked to provide consent for additional academic skills testing. They refused to sign the form because the same tests were already being administered by the parents' chosen neuropsychologist. The parents suggested that the district administer a different test. They did not refuse to cooperate with all testing.

On July 8, 2002, Stephen was accepted at Oakwood.

Three days later, the CSE met to finalize Stephen's placement for his senior year in high school. At that meeting, the CSE recommended that he be placed at Karafin, with various program modifications and testing accommodations, together with once a week counseling. The CSE continued to request additional academic skills testing and, on July 16, the parents consented to administration of the Woodcock-Johnson II test. Apparently, Dr. Rissenberg had not yet evaluated Stephen. No representative of Karafin was present at the CSE meeting.

On July 18 and again on July 23, the student's father sent a letter to the district "demanding" that an IEP based on the discussion at the July 11 CSE meeting be developed and sent to him immediately. In the July 23 letter, the father indicated that he would come and pick up the IEP. The district acceded to the request and finalized the IEP without reconvening or waiting for the additional test results.

The IEP was issued on the same day the Woodcock-Johnson II was administered to Stephen: July 31, 2002. The IEP that was developed notes Stephen's depression and anxiety. It concludes that he required special instruction in an environment with a smaller teacher-pupil

ratio and minimal distractions. It included goals and objectives to address the development of social skills, social/emotional/behaviors functioning, and career and vocational activities.

On August 15, the parents requested an impartial hearing, asserting that Karafin was an inappropriate setting for Stephen. He commenced attendance at Oakwood in September 2002.

**Dr. Rissenberg's Evaluation**

In October 2002, the private neuropsychologist completed her report of her August 31 evaluation of Stephen. She found evidence of very superior intellectual ability, social anxiety, inflexibility, poor social perception and depressed mood. She opined that Stephen's situation was consistent with a diagnosis of Asperger's syndrome, a mild autistic spectrum disorder, in the context of very superior intellectual capacity. Her recommendation was for an alternative academic placement with small classes and an individualized approach, instruction at a high level of conceptual complexity with students whose intellectual capacity was similar to Stephen's and with discussion-based learning and group participation. She also recommended that he be protected from bullying and ostracizing by peers. Dr. Rissenberg recommended various supports consistent with an attention deficit disorder, including extended time for tests, preferential seating, help with planning and organization and individual instruction as needed. She also recommended therapy, both individual and group.

**Impartial Hearing**

The impartial hearing convened on September 17 and continued on September 25, October 22, October 25 and November 12, 2002; and January 16, January 17, March 4 and March 25, 2003. The only issue was whether the district should pay for the parents' choice of private school, since the district agreed that private schooling was appropriate for Stephen.

The district defended its recommendation to place Stephen at Karafin. The hearing record shows that Karafin is a small school, with an enrollment of approximately 80 students and a staff of 40, including 17 full-time teachers, a full-time social worker and a staff psychologist. Teacher-pupil ratio is 6:1:1. The school serves students ages 12 to 21 in grades 8 through 12 who have learning and emotional disabilities, and who have above average cognitive abilities, with IQ scores ranging from 110 to 160. Students are grouped by ability and classes conform to state mandates for grouping students within a three- year range of Reading and Math abilities. This means that students at considerably different levels can find themselves in the same classroom. The school deals with any disparity in ability level by providing individualized attention (as is frequently the case in a special education classroom) during the period.

In grades 9 through 12, Karafin aims toward a Regents diploma, and 90% of its students attend college after they graduate. Management needs are addressed on an individual basis, and the school consults with the student's home district to ensure that all graduation and IEP requirements are met. Karafin has one student on the basis of a court referral, but the referral came out of a contentious divorce, not juvenile delinquency. The school denies accepting

mentally retarded students or using restraints on students. Regardless of what the parents may have been told by Dr. Donow, Dr. Greenfieldt (who was not present at the interview because he was allegedly monitoring the hallways or bathroom), denied accepting juvenile delinquents as students. (Tr. 399, 406). However, Dr. Greenfieldt also testified that his staff is trained in methods of handling physically aggressive students. (Tr. 407-08).

Unlike Oakwood – which is a traditional high school offering traditional high school courses in a traditional classroom setting – Karafin is a school geared to the provision of educational services for students with perceptual and neurological impairments, slow and unmotivated learners and students with reading problems. Dr. Greenfieldt, Karafin's witness at the impartial hearing, testified that Karafin was established as "a school for the underachiever." (Tr. 373). It does not employ traditional classroom-type instruction, and there are few opportunities for in-class participation in a group setting. Instead, the school is "more of a learning at your own pace type situation." (Tr. 780). Actual instructional groups often do not exceed two or three students, and are sometimes one-to-one. In contrast to a mainstream classroom (where the teacher provides a lesson to all students simultaneously and students discuss that lesson with others in a group setting) teachers at Karafin spend considerable time during a classroom period on a one-to-one basis with students who are at different levels of achievement, dealing with their individual needs at a pace appropriate to that student. In other words, its classrooms are more "special ed" than traditional. Karafin's founders were particularly interested in providing one-on-one instruction for underachievers. (Tr. 373).

Karafin is accredited by New York State for the provision of special education services, and its teachers are "dual certified" in both special education and a subject (e.g. English) or in communications disorders. (Tr. 371). The school lacks some of the accouterments of a more traditional college preparatory education. For example, Karafin does not have a physics lab. The school's director testified that Karafin could have offered Stephen a full Regents chemistry class during his senior year, including lab instruction. (Tr. 382). However, his parents were told during their visit to the school that chemistry would be offered only if three students wanted to take it, and that during the 2001-2002 school year (the year before Stephen was to attend), no student took chemistry at Karafin. (Tr. 779). If a subject cannot be offered during a particular school year, tutoring is provided on a one-to-one basis, albeit without labs. (Tr. 399).

Karafin, unlike Oakwood, does provide counseling on site, through a social worker or psychologist. (Tr. 390).

When there are behavioral conflicts at Karafin, teachers may leave the classroom to participate in an immediate counseling session with the student involved, in which case the classroom is presided over by an aide, who need have no more than a high school education. (Tr. 405). On their visit to Karafin, Stephen and his parents observed students disrupting classes and saw a teacher who was being verbally abused by a student leave the classroom in order to effect the removal of the student. (Tr. 400-01).

There is nothing in the record to indicate that there are any athletic or other extra-

curricular activities at Karafin that might have assisted Stephen in learning the social skills he so obviously lacked.

The testimony revealed that, when Stephen visited Karafin in March 2002, he felt threatened by the environment at the school and did not want to enroll there. By contrast, Stephen liked what he saw at Oakwood and expressed an interest in attending to his therapist. Stephen's therapist noted that Stephen displayed inflexibility in his thought processes, and so was unlikely to change his mind once he formed an opinion about something. Having formed a negative opinion about Karafin and a fearful attitude toward its student population, the therapist believed Stephen was unlikely to change his mind and so would not do well at the school or overcome his paralyzing social anxiety.

The therapist also opined that Oakwood was an excellent setting for Stephen. The boy's initial adjustment to the school was positive. The therapist indicated that Stephen's perception of Oakwood as a non-threatening environment was very much a factor in his success at the school. Stephen did well in the first semester at Oakwood, receiving grades ranging from B+ in English to C- in Spanish.[2] He also participated in extra-curricular activities.

In additional testimony, the treating psychiatrist opined that Karafin, the district's proposed placement, met only one of the criteria that were important to Stephen's placement– low teacher-to-student ratio. The psychiatrist indicated that Karafin would not meet Stephen's academic or emotional needs.

**The Administrative Decisions**

Both the IHO and the SRO, placing on the district the burden of proving the first Burlington factor, concluded that the district's recommendation of Karafin afforded Stephen a FAPE. Because Schaffer was not decided until three months after the SRO issued his decision, the IHO's and SRO's allocation of the burden of proof was appropriate.

## Decision

**IHO Bias**

I can dispose of the IHO bias issue quickly. I, like the SRO, conclude that there is no evidence of IHO bias; the parents' protests in this regard are sheer speculation. I do disagree with the factual finding, made by the state agency charged with investigating the parents' complaint, that the IHO mailed his decision to the parties on June 19, 2003. It would be understandable if one party failed to receive the decision at or about the time it was mailed, but it is simply not possible that none of the persons to whom the decision was allegedly mailed in

---

[2] Stephen's success at Oakwood is, of course, not a basis for concluding that the district's proposed placement was not calculated to provide him with a FAPE. However, it is some evidence about the propriety of the parents' unilateral placement.

11

June received it. However, there is no evidence that the IHO did not write the decision at or about the date indicated, or that the result he reached was in any way influenced by the parents' July 2003 complaint about the tardiness of the decision. Moreover, the issue was effectively mooted by the intervening decision of the SRO, who conducted his own review of the record and reached the same conclusion as the IHO.

**Procedural Irregularities**

I agree with the parents that the defendant district violated 8 NYCRR 200.4[d][4][i][a] and 34 C.F.R. 300.349[a][2] by failing to have a representative of Karafin present, either in person or by telephone, at the July 2002 CSE meeting in which the IEP recommending Stephen's placement was formulated. However, the purpose of having the private school representative at the meeting is so that the parents familiarize themselves with the recommended placement. Here, the parents had already visited Karafin, attended several classes, met with the school's associate director and had the opportunity to ask any questions they wished. They had already reached a conclusion that Karafin was an inappropriate placement for their son. Moreover, the district did not intend that the  July 2002 meeting would be the final meeting at which the IEP would be formulated. The CSE planned to reconvene again, after educational testing was completed, before issuing an IEP for Stephen. Had another meeting been convened after educational testing was completed, the district could have had a Karafin representative present to deal with questions on a complete record. But the parents short-circuited the IEP process and demanded that an IEP based on the July 2002 meeting be developed immediately. For these reasons, I concur with the SRO's conclusion that the technical procedural defect did not infringe on the parents' right to participate in the creation or formulation of their son's IEP.

The parents' other procedural challenges to the IEP are without merit, for the reasons given by the SRO in his opinion.

**The District's IEP Did Not Afford Stephen A FAPE**

And so we turn to the real issue: whether the district's proposed placement of Stephen at Karafin offered him a FAPE. With all respect to the learned administrative judges, I am constrained to conclude that the answer is no.

A New Wrinkle: *Schaffer v. Weast*

I first note that the legal landscape changed dramatically between the time of the impartial hearing and the submission of this matter to the court. Last term, the United States Supreme Court worked a radical change in the burden of proof to be applied in an IDEA administrative proceeding in this Circuit.

In Burlington School Committee v. Department of Education, 471 U.S. 359 (1985), the Supreme Court announced the three so-called "Burlington factors" that must be established in an IDEA impartial hearing. Thereafter, the Second Circuit (as well as many other courts) concluded

that Burlington imposed on the school district the burden of proving the first factor: the adequacy of the IEP.  If the district failed to do so, the parents would bear the burden of proving the other two "Burlington factors." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 2001); M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000), *cert denied*, 532 U.S. 942 (2001). This rule was well-settled at the time of the hearing into Stephen's IEP and no doubt influenced how both sides – but particularly plaintiffs – chose to question witnesses and submit evidence. It is also the standard under which the IHO reviewed the evidence and the SRO reviewed the IHO's conclusions.

In Schaffer v. Weast, 126 S.Ct. 528 (2005) –  which came down three months after the SRO issued his decision –  the Supreme Court announced that the party who commences an impartial hearing (which is almost invariably the parents) bears the burden on all three of the Burlington factors, including the IEP's inadequacy. The IHO and SRO thus erred (albeit unwittingly) by imposing on the defendant district the burden of proving that the IEP provided Stephen with the education mandated by IDEA.

Obviously, Schaffer has no direct relevance to this appeal. In an IDEA lawsuit in a federal court, the plaintiff who brings the case always shoulders the burden of demonstrating that the SRO's decision was wrong.  But the record I am reviewing was compiled by attorneys, and evaluated by administrators, who were operating under a different set of rules.  I can easily see how both sides – especially the parents, who had no idea that they were the proponents of all three Burlington factors – might have done things differently at the hearing had they anticipated Schaffer. When one does not have the burden of proof, sound litigation strategy might well dictate that certain questions not be asked, that record matters left open by an opponent not be clarified, that witnesses whose testimony would otherwise be necessary not be called, and that exhibits that could have been relied on not be introduced. As a result, I can well imagine cases in which it would be both fair and appropriate to deny the motions for summary judgment and to hold a hearing, so that the parents have an opportunity to present evidence that they would have introduced if only they had known they shouldered the burden of proof at the administrative level.

However, there is no need to order such a hearing in this case. After reviewing the record as though the burden of proof had been on the parents, I am left with the firm conviction that Stephen's IEP was not adequate for his needs because it did not provide Stephen with an education in the "least restrictive environment."

Karafin Did Not Provide Stephen with an
Education in the Least Restrictive Environment

Federal and state regulations require that, to the maximum extent appropriate, each child must be educated in the least restrictive environment. 34 C.F.R. 300.330(b)(1); 8 NYCRR 200.6(a)(1). The "least restrictive environment" (LRE) is the one that (1) provides the special education needed by the pupil (2) to the maximum extent appropriate with other pupils who do not have handicapping conditions, and (3) is as proximate as possible to the pupil's place of

residence. 8 NYCRR 200.1(cc).

The IEP identified Stephen's area of primary deficit as "social anxiety." The record strongly supports this. Stephen is uniformly identified as a bright young man capable of doing college-preparatory academic work. When he is not in a state of high anxiety, his performance in school bears this out. I thus have no quarrel with the SRO's conclusion that Stephen's principal issue was his anxiety. Where I part company with him is in his conclusion that the proper way to address this issue was to enroll Stephen at Karafin.

The SRO concluded that the school chosen by the district – a school 90 minutes and two counties away from the child's home, in which regular, structured classes are not the norm – was an appropriate place to send a child who would not (and apparently could not) go to school for fear of bullying and harassment. In so concluding, the SRO never once mentioned the words "least restrictive environment," let alone considered whether Stephen's placement at Karafin satisfied that standard. And while the IHO paid lip service to this requirement by throwing the phrase "least restrictive environment" into his decision, he failed to enumerate the factors that go into an LRE determination or to discuss whether placement at Karafin satisfied them.

Because the SRO made no findings on this issue, there is no administrative determination to which I can or should defer. I examine the issue for the first time.

*Providing Needed Services*

The first of the three LRE factors is providing the special education services needed by the student. Close analysis of the record reveals that Karafin did not offer what Stephen needed.

Karafin undoubtedly provides its students with "individualized instruction in a small, supportive setting," as found by the SRO. However, it appears from the record that Stephen had little if any need for "individualized instruction" in his academic classes. And the "small and supportive" setting Stephen needed was not the sort that Karafin provides.

I take as my starting point the fact that Karafin offered a 6:1:1 (six students to one teacher and one aide) classroom setting. Under New York's IDEA regulations, such a setting is appropriate only for students with *highly intensive management needs* (i.e., students whose management needs interfere with the instructional process) and who thus require a *high degree of individualized attention* and intervention. 8 NYCRR 200.6(f)(4)(I) and (g)(4)(ii)(a) (emphasis added).

Stephen had no special management needs that interfered with the instructional process in a regular classroom. He did not disrupt classes or act out.

Stephen did not require a high degree of individualized attention in the classroom. He was not severely learning disabled. Indeed, he does not even appear to be moderately learning disabled. He has at most some mild learning "issues" that may well be exacerbated by his

emotional problems. Remove the emotional problems and the record reveals a boy who was capable of performing at an average or higher level in Regents-level college preparatory classes with little or no outside assistance. The fact that Stephen's academic performance improved markedly when he was home tutored does not mean that Stephen required one-on-one instruction in order to master his academic subjects. That, no doubt, is why Stephen's IEP indicated that he needed a smaller student-to-teacher ratio, but did not call for one-on-one academic instruction in the classroom. (Ex. 5).

In a 6:1:1 classroom, Stephen necessarily would receive a great deal of individualized instruction – far more than he required. But that, of course, necessarily would reduce his interaction with other students. Dr. Ditkowsky of NYU stressed that Stephen needed "not only the [academic] credit, but also the social interaction." (Ex. 10). The outside neuropsychologist recommended the same thing.[3] That is the antithesis of the one-on-one teaching that Karafin (justifiably) prides itself on providing. No one, as far as I am aware, ever recommended putting Stephen is a "special education" classroom of the sort contemplated by the 6:1:1 regulations.

Pursuant to state regulation, the other five students in a 6:1:1 classroom could be as many as three grades behind Stephen in their studies. 8 NYCRR 200.6(g)(5). This also would not meet the goal of providing Stephen with the sort of academic challenge he needed. Every expert who examined Stephen indicated that he needed to be in an environment where academic instruction was at a high level. As early as December 2001, Stephen's therapist noted that, while a smaller teacher-to-student ratio was recommended, he needed to be in a classroom that "upholds a strong academic curriculum to challenge his superior intelligence." (Ex. 29). Likewise, Dr. Ditkowsky of NYU cautioned the CSE that it would be counterproductive for Stephen to be placed in "a setting where, you know...the academics are limited. That they give you support but the academic program is way below him, and I think that in and of itself would be on one those sorts of triggers that would...just make it difficult for him to negotiate." (Ex. 116).

Karafin provides one-on-one instruction during the classroom period and offers private tutoring when particular academic subjects (such as a challenging science course) are unavailable in the regular curriculum. But extensive use of one-on-one teaching and outside tutoring would seem to defeat the point of sending Stephen to a private school. He experienced nothing but one-to-one teaching while he was tutored at home. The idea, as Dr. Ditkowsky expressed it, was to reintegrate him into a normal academic and social environment, so he could learn to function socially.[4] Karafin's 6:1:1 classroom simply does not provide that sort of

---

[3] Dr. Rissenberg's opinion was not before the CSE when it formulated the IEP, but I may consider it nonetheless.

[4] The SRO erred in concluding that recommendations for Stephen to participate in group activities and develop social skills were not before the CSE because they were first raised by the privately-retained neuropsychologist, Dr. Rissenberg, whose report was not delivered until after the CSE (at plaintiffs' request) issued Stephen's IEP. (SRO Decision at 14). Dr. Rissenberg's observations about Stephen's need for group interaction and social skills development were part

environment.

The SRO placed a great deal of emphasis on Dr. Greenfieldt's testimony (which I do not question for one moment) that Karafin provided a "small... supportive program" and offered its students individualized attention. (Tr. 387). Stephen needed both a small, supportive environment and individualized attention, but those phrases cover a lot of ground. Where public school mainstream classes can have 20, 25 or 30 students, a 12:1 or 15:1 classroom qualifies as a "small" setting. "Supportive" could refer to academic support (of which Stephen did not need a great deal), or emotional support (of which he needed a great deal), or behavioral support (which he did not need at all). And individualized attention could range from having a 1:1 aide at a child's side to offering a child someone to talk to when things were not going well– the sort of "point person" for dealing with anxiety issues that Dr. Ditkowsky recommended for Stephen. (Ex. 116).[5]

In other words, the fact that Karafin offers a "small... supportive program" with individualized attention does not automatically mean that Karafin was the sort of school Stephen needed.

The district's own CSE concluded that Stephen was sensitive to peer grouping. (Ex. 5). Placing the boy in a classroom with students who could be as much as three years behind him in academic achievement, and who required extensive individualized academic instruction, seems an odd way of addressing this issue. A 6:1:1 school is a school for children who are highly disruptive or who have great difficulty learning unless they are taught in a closely monitored setting with a great deal of individual attention. That description does not fit Stephen. Grouping him with such students would not be grouping him with his peers.

Neither the IEP nor the record at the hearing reveals any basis for concluding that either Stephen's management needs or his academic skills required him to be educated in such a restrictive academic setting. Karafin is no doubt a very fine school, but it is clearly a school for students whose issues differ significantly from Stephen's. While it provides special education services (and is certified by the State of New York to do so), Karafin does not provide the sort of special education needed by Stephen G. It was, therefore, not the "least restrictive environment" for the boy.

*Mainstream Opportunity and Distance*

As for the other two LRE factors: Karafin does not provide its students with any opportunity to spend time in mainstream classrooms with students who are not learning disabled. Nothing in the record suggests that Stephen needed to be in a special education classroom for the

---

of the recommendations of Dr. Ditkowsky (Ex. 10) and Stephen's private therapist (Ex.118).

[5] It bears noting that the "point person" did not have to be a therapist; Dr. Ditkowsky was quite clear in stating that Stephen did not necessarily need to be in a "therapeutic" environment.

entire academic day.

Finally, Karafin is very, very far from Stephen's home – about 50 miles, or a good 70-75 minute drive (more if traffic is bad). Even if Karafin offered extra-curricular activities, the time needed to travel from the Poughkeepsie area to Mt. Kisco would dramatically restrict, if not eliminate, Stephen's chance to participate in them.

The SRO considered none of this. He never discussed the availability of mainstream educational opportunities or the extraordinary distance Stephen would have had to travel to get to school. Instead, he credited the extremely unspecific testimony of Dr. Greenfieldt and fastened on the fact that Karafin provides its students with a "small, supportive setting" and classes having a low student-to-teacher ratio. But it does so in a setting that is far too restrictive for this student's needs.

The evidence in the record demonstrates that placing Stephen at Karafin did not offer the boy a FAPE in the least restrictive environment. For that reason, the first Burlington factor – the insufficiency of the IEP – is satisfied.

**The Parents Are Entitled to Burlington Reimbursement**

Oakwood Was A Proper Placement For Stephen

The fact that placement at Karafin was inadequate and inappropriate does not automatically lead to the conclusion that the parents are entitled to be reimbursed for tuition to Oakwood. The SRO, having erroneously concluded for the district on the first issue, never opined about whether the parents had proved that Oakwood was a proper placement for Stephen or whether they are equitably entitled to tuition reimbursement. The IHO, however, concluded that the parents failed to satisfy the second Burlington factor because Oakwood could not provide him with either special education or coordinated therapeutic services.

As noted above, to satisfy their burden on this issue the parents must show that their unilateral placement offered an educational program that met their child's special needs, and so was proper under IDEA. M.S., 231 F. 3d at 102; Walczak, 142 F. 3d at 149. Unlike the IHO, I conclude that the parents have satisfied their burden by showing that Oakwood offered Stephen exactly what he needed – academic challenge in an environment that refused to tolerate the sort of bullying that led to Stephen's retreat from the academic mainstream in the first place.

Oakwood, like Karafin, offered Stephen a setting that was both small and supportive. Stephen's classes had between 12 and 15 students in them – larger than Karafin, but fewer than public school. The 12:1 classroom ratio at the school was "small" in comparison to average class size at Arlington High School, yet big enough to give Stephen the chance to reintegrate into a normal classroom setting before he applied to college. And the school was "supportive" of his emotional needs. It protected him from teasing or bullying or ostracism because it refused to tolerate such behavior. Because the faculty inculcated all Oakwood students with Quaker values

17

of tolerance and respect, Stephen could approach his classes without fear. And the traditional classroom setting allowed Stephen to benefit from the sort of group activities and discussion that Dr. Ditkowsky and the others who evaluated the boy deemed crucial, not only to his academic success, but also to the development of his impaired social skills.

It does not matter that most of Oakwood's teachers are not certified by the State of New York. I would be closing my eyes to the obvious if I failed to observe that many if not most teachers at New York State's finest private schools – schools that have historically sent their graduates to the nation's finest colleges and universities – are not state-certified as teachers.

Nor does it matter that Oakwood has no certified "special education" teachers on staff, or that it does not create IEPs. A parental placement can qualify as appropriate even if there are no such teachers or IEPs at the chosen private school. Carter, *supra.,* 510 U.S. at 14. As I have already observed, Stephen's primary deficit was emotional, not academic. He did not need to be in a special education classroom, so the absence of special education teachers does not weigh heavily in this case. Moreover, the IHO is simply wrong when he says that Oakwood does not offer special education services. According to its literature, Oakwood admits students like Stephen – that is, students who have mild, documented learning differences – and provides them with academic support as required. (Ex. 96). Stephen does not appear to have needed more academic support than Oakwood was equipped to provide. His good grades while at Oakwood prove as much.

The most difficult hurdle for the parents is the fact that Oakwood did not have a resident psychologist to provide Stephen with in-house counseling, as Karafin did. All of Stephen's evaluations indicated that he suffered from severe depression. Counseling was recommended in his IEP. Oakwood was not equipped to provide that counseling. The IHO and the district both latch onto that deficit; the district even argues that Oakwood's director did not appear to understand that Stephen needed counseling.

However, according to Dr. Ditkowsky, Stephen did not need a school with a "therapeutic" environment. He needed an environment that was either therapeutic *or supportive*. It appears that, in combination with his private therapy (which the parents planned to continue no matter where Stephen went to school), Oakwood offered Stephen something just as important, if not more important, than an on-site psychologist: freedom from fear. When the Director of Oakwood testified that she had not seen any emotional disturbances in Stephen (Tr. 623), she was neither lying nor demonstrating ignorance, as the district intimates in its brief. Rather, she was describing the liberating effect that an environment free from teasing and ostracism had on a child whose only previous protection from bullying had been to stay at home.

### The Plaintiffs Are Equitably Entitled To Reimbursement

The third and final Burlington factor is equitable entitlement to reimbursement. Again, the only person who opined on this issue was the IHO. He concluded that equitable considerations did not favor parental reimbursement, because the parents did not fully cooperate

with the district by preventing the CSE from conducting evaluations at an earlier date and by not being open with the district about their intention to enroll Stephen at Oakwood should he be admitted there. Neither party has bothered to brief this issue, but the court cannot ignore it.

I conclude that the parents are equitably entitled to reimbursement.

Contrary to the IHO's finding of non-cooperation, the record reflects a long period of cooperation between the parents and the school district, from the time when Stephen's anxiety first manifested until the relationship deteriorated in early 2002. Indeed, the relationship between Stephen's parents and the school district did not deteriorate until after the parents visited the schools the district was recommending for Stephen – schools like Karafin – and the family became alarmed that the boy's needs would not be met. Until that time – indeed, through the CSE meeting of February 11, 2002, when the parents signed releases so that information about Stephen could be sent to Karafin and the other schools the district wanted the parents to consider– the record reveals that the parents were completely cooperative. They did not even contact counsel until after the family visited Karafin on March 1, 2002.

There is no question that the relationship between the family and the district deteriorated significantly in the months that followed the Karafin visit. However, the parents provided consent for the administration of further testing by the district as late as July 16, 2002. The only consent that the parents refused was for testing proposed by the district that was duplicative of testing already being performed by Dr. Rissenberg. Their refusal to consent to purely duplicative testing can hardly be deemed an instance of unreasonable non-cooperation.

The parents' "demand" that the district provide them with an IEP for Stephen on and after July 18, 2002, did short-circuit the CSE process, as noted above. However, it was the fault of both parties – the parents for insisting on additional outside evaluation, the district's for not having a representative of Karafin at the July 11 meeting – that no IEP could be finalized at that time. The parents wanted to wait for the results of Dr. Rissenberg's evaluation; the district failed to have any Karafin representative present at the July 11 meeting. The district's failure to abide by IDEA regulations may have been "technical," but it estops the district from relying on the parents' "premature" demand for an IEP, since the district was unquestionably late in finalizing its plans for Stephen's senior year.

The parents obviously formed an intention to send Stephen to Oakwood sometime in the early spring of 2002, yet they did not advise the district that they were applying to Oakwood. The IHO cites this as additional evidence of non-cooperation.

In cases where the parents' unstated goal all along was to place their son at a particular private school, and where any cooperation by the family was either minimal or pro forma, this court has not hesitated to conclude that the equities favor the school district. But this is not such a case. The parents did not apply to Oakwood until sometime in April 2002. They did so only after they had consented to extensive evaluation of their son by the CSE and visited five different schools suggested by the district, including Karafin. Rather than being their unstated agenda

after they had consented to extensive evaluation of their son by the CSE and visited five different schools suggested by the district, including Karafin. Rather than being their unstated agenda from the beginning, Oakwood appears to have been a solution arrived at by the parents once they decided that the district was not proposing any viable alternative for their son. Since this court has concluded that Karafin was not an appropriate placement for Stephen, I can hardly say that the family was wrong to look for alternatives.

Finally, I come back to where I started. This is not a case in which the alternative to private school was a FAPE in a public school setting. The district and the parents agreed that Stephen should spend his senior year in a private school. However, the district appears to have been fixated on placing the boy in a school where the district would itself receive New York State reimbursement for the cost of his private school education. Unfortunately for the district, the "free" in FAPE means free to the student, not to the district. Under the circumstances, it does not lie in the district's mouth to accuse the parents of unclean hands.

## Conclusion

The district's motion for summary judgment is denied and the parents' motion is granted. Arlington Central School District is hereby ordered to reimburse plaintiffs for the cost of Stephen's senior year's tuition at Oakwood Friends Academy. The clerk of the court is directed to enter judgment for plaintiffs and to close the file.

Dated: March 3, 2006.

_____
U.S.D.J.

BY FAX TO:

Rosalee Charpentier, Esq.
Jeffrey Schiro, Esq.